CHICAGO, M. & ST. P. RY. CO. v. TOMPKINS et al.

(Circuit Court, D. South Dakota. July 6, 1898.)

1. CARRIERS—STATE REGULATION OF RATES—CONSTITUTIONALITY.

A state having lawful authority, either by legislative enactment or through a commission, to establish rates and fares for the carriage of freight and passengers between points within its limits, rates and fares so established are prima facie lawful and valid, and, to authorize a court to interfere with their enforcement, it must be shown beyond a reasonable doubt that such enforcement will result in depriving individuals or corporations affected thereby of their property without due process of law or of the equal protection of the laws.

2. SAME—INDEBTEDNESS OF RAILROADS.

The power of a state to establish rates and fares for the carriage of freight and passengers within its jurisdiction cannot be destroyed by the sum which a railroad company may be pleased to charge to the operating expenses of its road in the state or the amount of indebtedness it may have created on such road.

3. SAME—BASIS FOR COMPUTATION OF LOCAL EARNINGS.

Under the rule announced by the supreme court in Smyth v. Ames, 18 Sup. Ct. 434, 169 U. S. 546, that, in fixing its schedule of rates and fares, a state cannot charge against a railroad company its interstate earnings, the only method of arriving at a true and just valuation upon which to figure local earnings is to ascertain what per cent. the local earnings constitute of the gross earnings of the road in the state, and to take the

same per cent. of the total value of its property in the state as the capital which is invested to produce the local earnings.

**4. SAME—CONSTITUTIONALITY OF STATE TARIFF RATES.**

Where a computation based upon the evidence shows that the gross local earnings of a railroad for the four preceding years, under a schedule of rates and fares proposed to be put into effect by the state, would have been from 12 to 18 per cent. upon the value of the property used to produce such earnings, varying in the different years, a court cannot say, beyond a reasonable doubt, that such schedule is unconstitutional, as depriving the company of its property without due process of law.

This is a suit in equity by the Chicago, Milwaukee & St. Paul Railway Company against William H. Tompkins, W. T. La Follette, and Alexander Kirkpatrick, constituting the board of railroad commissioners of the state of South Dakota.

George R. Peck and A. B. Kittredge, for complainant.
T. H. Null and W. O. Temple, for defendants.

CARLAND, District Judge. The above-entitled action has been submitted upon pleadings and proofs. The object of the action is to perpetually restrain the defendants, as railroad commissioners of the state of South Dakota, from putting in force a certain schedule of rates and fares made by them on the 26th day of August, 1897, prescribing the rates and fares to be charged by common carriers within the state of South Dakota for the carriage of passengers and freight. At the time of the filing of the bill, a temporary injunction was issued, and the defendants have, in the meantime, been restrained from putting into effect the schedule referred to. The testimony that has been reported by the examiner is quite voluminous, consisting of about 1,000 pages of printed matter, but the testimony which must really decide this case is not of great length.

In the first place, it is proper to state, briefly, the principles of law which have been established by the supreme court of the United States for the guidance of this court in deciding actions of this character.

In Smyth v. Ames, 169 U. S. 526, 18 Sup. Ct. 426, the supreme court declares the following principles of law to be settled:

"(1) A railroad corporation is a person, within the meaning of the fourteenth amendment declaring that no state shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

"(2) A state enactment, or regulations made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroad, that will not admit of the carrier earning such compensation as, under all the circumstances, is just to it and to the public, would deprive such carrier of its property without due process of law, and deny to it the equal protection of the laws, and would therefore be repugnant to the fourteenth amendment of the constitution of the United States.

"(3) While rates for the transportation of persons and property within the limits of a state are primarily for its determination, the question whether they are so unreasonably low as to deprive the carrier of its property without such compensation as the constitution secures, and therefore without due process of law, cannot be so conclusively determined by the legislature of the state, or by regulations adopted under its authority, that the matter may not become the subject of judicial inquiry."

In approaching the consideration of this case, guided by the above principles of law, the court fully appreciates the difficulty and em-

barrassment which surround the decision of a question where it is sought to have the court declare the legislative action of a state unconstitutional, and where the decision of the facts involved requires the exercise of knowledge with which courts of justice are presumed to have but little acquaintance.

It is now settled law that a state, by legislative enactment, may directly itself, or through a board of commissioners, establish rates and fares for the carriage of freight and passengers between points within its limits. This being an exercise of lawful legislative authority on the part of the state, all acts in pursuance thereof, either by the state directly or by its commissioners, must be presumed, until the contrary clearly appears, to be within the legislative authority and valid. It necessarily follows, also, that when a board of railroad commissioners, authorized by a law of the state to fix rates and fares for the carriage of freight and passengers within its limits, fixes those rates, that those rates and fares are prima facie reasonable and just. It is also provided, by the act of the legislature under which the defendants are claiming to act, that the rates and fares established by them, or any schedule of such rates and fares, shall be prima facie evidence that the rates are reasonable and just, in any controversy where they shall come in question. It thus appears that the burden of proof is upon the complainant to establish, beyond a reasonable doubt, that the rates and fares which the defendants are seeking to put in force will, if lawfully made and promulgated, result in the taking of complainant's property without due process of law, or will deprive the complainant of the equal protection of the law. In other words, the complainant must show the court that the acts of the defendant commissioners are unconstitutional, as being in conflict with the constitution of the United States.

While it is true that the legislature of a state may not, under its power to regulate rates and fares for the carriage of freight and passengers within its limits, deprive the complainant, or any other person or corporation, of its property without due process of law, or deprive it, or any other person, of the equal protection of the laws, it is also equally true that this court has no power or authority, given by statute or common law, to fix rates and fares for the carriage of freight and passengers upon the complainant's lines, or to revise in any manner rates established by the defendants as railroad commissioners. The court only has the power and jurisdiction to declare acts of the legislature, or of the board of railroad commissioners performed in pursuance thereof, unconstitutional, if clearly in conflict with the constitution of the United States. No court will declare an act of a legislature unconstitutional without it is shown to be so beyond a reasonable doubt.

This, then, gives the status of the complainant in this action before this court. This court must be satisfied, beyond a reasonable doubt, that the schedule of rates proposed to be promulgated and put in force by the railroad commissioners, the defendants in this action, will, if so put in force, deprive the complainant of its property without due process of law, or deprive it of the equal protection of the law.

We now come to consider the evidence which has been reported in this action upon which it is asked that this court issue a permanent injunction against the defendants as railroad commissioners, enjoining them from putting into force the rates and fares complained of.

The first contention of the complainant is that the record shows that during the fiscal years ending June 30, 1894, 1895, 1896, and 1897, the complainant, under the rates and fares which are now in force upon its system for the carriage of freight and passengers, was not able to earn sufficient money to pay its operating expenses in the state of South Dakota, its taxes in the state of South Dakota, and the interest due upon the bonded debt upon that portion of its lines located within the state of South Dakota, and that there was a deficiency beween the earnings in the state of South Dakota, from all sources, during the said years, and the operating expenses, taxes, and interest of said years, of $2,729,858.81,—being $507,080.52 for the fiscal year ending June 30, 1894; $841,500.89 for the year ending June 30, 1895; $773,343.41 for the year ending June 30, 1896; and $607,933.99 for the fiscal year ending June 30, 1897.

If it is the law that the power of the state to regulate fares and rates for the carriage of passengers and freight within its jurisdiction does not arise or become operative until some railroad corporation has paid all the debts it may have seen fit to contract, or paid all the expenses which it is pleased to charge to the account of operating expenses, then the power in the state to regulate rates and fares is worthless, and of no avail to prevent the exaction of exorbitant charges from the public for the services rendered. This cannot be the law. No court has yet held it to be the law, and it is not believed any court will ever be found which will hold it to be the law. Such a proposition violates the rules of common sense, and is maintained with a seeming forgetfulness that the power of the state to regulate the rates and fares for the carriage of freight and passengers cannot be contracted away and rendered nugatory by contracts between third parties, to which the state has never consented to become a party.

The case of Smyth v. Ames, supra, did not decide as to just how much a railroad corporation, or any other person or corporation, could earn before the state would have a right to reduce the rates and fares for the carriage of passengers and freight within its limits. It did say that just how such compensation may be ascertained, and what the necessary elements are in such an inquiry, would always be an embarrassing question. In the case of Road Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, the supreme court said:

"Each case must depend upon its special facts; and when a court, without assuming itself to prescribe rates, is required to determine whether the rates prescribed by the legislature for a corporation controlling a public highway are, as an entirety, so unjust as to destroy the value of its property for all the purposes for which it was acquired, its duty is to take into consideration the interests both of the public and of the owner of the property, together with all other circumstances that are fairly to be considered in determining whether the legislature has, under the guise of regulating rates, exceeded its constitutional authority, and practically deprived the owner of property without due process of law. * * * The utmost that any corporation operating a public highway can rightfully demand at the hands of the legislature,

when exerting its general powers, is that it receive what, under all the circumstances, is such compensation for the use of its property as will be just, both to it and to the public."

In regard to whether the contention of the complainant that it has a right to earn enough to pay all of its fixed charges, operating expenses, and taxes before the right of the state to interfere becomes operative, the supreme court in the case of Smyth v. Ames, 169 U. S. 543, 18 Sup. Ct. 432, says:

"In the discussion of this question, the plaintiffs contended that a railroad company is entitled to exact such charges for transportation as will enable it, at all times, not only to pay operating expenses, but also to meet the interest regularly accruing upon all its outstanding obligations, and justify a dividend upon all its stock; and that to prohibit it from maintaining rates or charges for transportation adequate to all those ends will deprive it of its property without due process of law, and deny to it the equal protection of the laws. This contention was the subject of elaborate discussion; and, as it bears upon each case in its important aspects, it should not be passed without examination. In our opinion, the broad proposition advanced by counsel involves some misconceptions of the relations between the public and a railroad corporation. It is unsound, in that it practically excludes from consideration the fair value of the property used, omits altogether any consideration of the right of the public to be exempt from unreasonable exactions, and makes the interests of the corporation maintaining a public highway the sole test in determining whether the rates established by or for it are such as may be rightfully prescribed as between it and the public. A railroad is a public highway, and none the less so because constructed and maintained through the agency of a corporation deriving its existence and powers from the state. Such a corporation was created for public purposes. It performs a function of the state. Its authority to exercise the right of eminent domain and to charge tolls was given primarily for the benefit of the public. It is under governmental control, though such control must be exercised with due regard to the constitutional guaranties for the protection of its property. Olcott v. Supervisors, 16 Wall. 678, 694; Sinking Fund Cases, 99 U. S. 700, 719; Cherokee Nation v. Southern Kansas Ry. Co., 135 U. S. 641, 657, 10 Sup. Ct. 965. It cannot, therefore, be admitted that a railroad corporation maintaining a highway under the authority of the state may fix its rates with a view solely to its own interests, and ignore the rights of the public. But the rights of the public would be ignored if rates for the transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public or the fair value of the services rendered, but in order simply that the corporation may meet operating expenses, pay the interest on its obligations, and declare a dividend to stockholders. If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates as may be required for the purpose of realizing profits upon such excessive valuation or fictitious capitalization; and the apparent value of the property and franchises used by the corporation, as represented by its stocks, bonds, and obligations, is not alone to be considered when determining the rates that may be reasonably charged. What was said in Road Co. v. Sandford, 164 U. S. 578, 596, 597, 17 Sup. Ct. 198, 205, is pertinent to the question under consideration. It was there observed: 'It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a given per cent. upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public. * * * The public cannot properly be subjected to

unreasonable rates in order simply that stockholders may earn dividends. The legislature has the authority, in every case, where its power has not been restrained by contract, to proceed upon the ground that the public may not rightfully be required to submit to unreasonable exactions for the use of a public highway established and maintained under legislative authority. If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it and them, which the constitution does not require to be remedied by imposing unjust burdens upon the public. So that the right of the public to use the defendant's turnpike upon payment of such tolls as, in view of the nature and value of the services rendered by the company, are reasonable, is an element in the general inquiry whether the rates established by law are unjust and unreasonable.' A corporation maintaining a public highway, although it owns the property it employs for accomplishing public objects, must be held to have accepted its rights, privileges, and franchises subject to the condition that the government creating it, or the government within whose limits it conducts its business, may, by legislation, protect the people against unreasonable charges for the services rendered by it. It cannot be assumed that any railroad corporation, accepting franchises, rights, and privileges at the hands of the public, ever supposed that it acquired, or that it was intended to grant to it, the power to construct and maintain a public highway simply for its benefit, without regard to the rights of the public. But it is equally true that the corporation performing such public services and the people financially interested in its business and affairs have rights that may not be invaded by legislative enactment, in disregard of the fundamental guaranties for the protection of property. The corporation may not be required to use its property for the benefit of the public without receiving just compensation for the services rendered by it."

This being the latest announcement by the supreme court upon this question, it must be taken as the law, and nowhere can it be gathered from its language that the complainant has a right to pay all of its indebtedness before the state can regulate its charges for the carriage of passengers and freight. The court, therefore, dismisses the proposition that the defendant railroad commissioners cannot reduce the present schedule of rates and charges now in force upon the complainant's lines merely because it is shown that the earnings therefrom do not pay the indebtedness and operating expenses of the complainant, as the complainant company itself never seems to have been able to adopt a schedule that would accomplish that object, nor, in face of the record, can the complainant claim that it ever adopted a schedule of rates and fares upon its lines within the state of South Dakota which was based upon the value of the services rendered. Mr. Bird, general traffic manager of the complainant, a witness for the complainant, when upon the stand, testified as follows:

"I testified this morning that I had been in the service somewhat over thirty years, and had been engaged in making rates during that time, and I never have yet had an opportunity of making a tariff on a basis of what the service was worth. I have never had the opportunity to determine the rate by the value of the services. The rates are made what they must be."

The supreme court in the case of Smyth v. Ames, 169 U. S. 546, 18 Sup. Ct. 434, declared as follows:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as

compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

Here is the rule, and the only question for the court now to ascertain is, what is the fair present value of the railroad property used by the complainant, in the state of South Dakota, upon which it is entitled to earn what the services rendered are reasonably worth?

There is no direct testimony in the record as to the present value of the complainant's railroad property in the state of South Dakota. There is testimony as to the original cost of rolling stock bought years ago; there is testimony as to the original cost of rails bought years ago; and there is the estimated cost of a good many articles of property, by the officers of the company, but in no case does any witness swear to the present actual value of any piece of property owned and operated in the state of South Dakota by the complainant company. The only way that the court can get at the reasonably fair value of the complainant's property, used and operated as aforesaid, is by estimating, I might say guessing, just as the witnesses of the complainant have estimated and guessed, as to its value. The court was inclined at one time to be of the opinion that it was unable from the testimony to ascertain what the fair present value of the complainant's property in South Dakota was, in view of the conflicting statements of witnesses called upon that question, and the great disparity between the value of the property fixed by the company for the purpose of this suit and the value of the same property fixed for the purpose of taxation. But the court has carefully examined the testimony introduced in regard to the value of the property in question, and after considering all the circumstances and incidents, under the rules of the supreme court which should govern the court in fixing the value. the court is unable to find that the present fair value of the complainant's property in the state of South Dakota used for railroad purposes is to exceed $10,000,000. It is true that the record shows that the property is bonded and mortgaged for an amount largely in excess of this sum, but the amount of a mortgage upon property is no evidence of its value, and, therefore, is not worthy of consideration. Neither is the fact that a railroad company bought engines at a certain price 10 or 15 years ago any binding evidence that the engines now are worth a dollar, in the absence of any testimony as to where they have been used, how they have been kept, and what their present condition is. The record fairly shows that it is not the new property of the complainant company that is used in South Dakota.

This being fixed by the court as the fair and reasonable value of the complainant's railroad property, what would be a reasonable sum for it to charge for the services which it renders to the public? The

90 F.—24

supreme court in the case cited says that the state, in fixing its schedule of rates and fares for the transportation of passengers and freight, cannot consider and charge against the company its interstate earnings. While the complainant company strenuously insists upon the enforcement of this rule, it as vigorously insists that the per cent. which the state may allow the complainant to earn must be figured upon the total value of its property in the state, because all the business in the state of South Dakota transacted by the complainant is local business, with the exception of an occasional train of cattle from Chamberlain or an occasional train of wheat from Eureka, and that, therefore, all the cost of operation should be charged to the local earnings. In other words, that although for the four fiscal years ending June 30, 1894, 1895, 1896, and 1897, respectively, the interstate earnings in the state of South Dakota were $4,026,682.21, still the state cannot charge against the road these interstate earnings, but may charge against the road its local earnings, the percentage of local earnings to be figured on the total value of the property in the state, thus leaving the interstate earnings relieved from any burden. Is this fair, is it just, for the company to say to the state of South Dakota that "while it is true that, in the four years mentioned, we have earned, on interstate business in the state of South Dakota, the sum of $4,026,682.21, still you cannot charge that against us, but you can only charge your local earnings, figured on the total valuation of our property ($10,000,-000), and that local earnings are such a small percentage of the total value of the railroad in South Dakota that it does not give the company what the services are reasonably worth"?

The argument for the company is that the court cannot separate the value of the property with reference to the earnings, because it requires all the property and all the machinery and all the labor to earn the local earnings. Admitting this to be so, it still remains that, during the years which the court has mentioned, the company earned, in interstate business, by the use of this property and under the franchises granted to it by the state of South Dakota, the sum of $4,026,682.21. So that it is entirely unjust to make the local earnings bear the whole burden by ascertaining the per cent. of the total valuation that the local earnings would produce. No court as yet has promulgated any rule as to how this court shall arrive at a true and just valuation upon which to figure local earnings. In the absence of any such rule, this court believes that it is fair and just to first ascertain what per cent. of the total gross earnings in any one year the total local earnings are for that year, and, having ascertained that per cent., to take the same per cent. of the total value of the property as a fair value upon which to fix local earnings. Following out this rule, let us take the four fiscal years immediately prior to the institution of this suit, and ascertain what per cent. the local earnings for these years would have earned upon a valuation thus determined, and what reduction of that percentage will be made by the schedule sought to be promulgated by the defendants, and which it is stated reduces the present tariff of complainant, speaking in round numbers, 15 per cent. on local passenger business, and 17 per cent. on local freight business. The total earnings from all sources of the complainant company on its

lines in the state of South Dakota, for the fiscal year ending June 30, 1894, were $1,840,651.79. The total local earnings for freight and passenger services during the same period were $407,606.35. In round numbers, this would make the local earnings 22 per cent. of the gross earnings from all sources for the year 1894. Twenty-two per cent. of $10,000,000, the value of complainant's property in the state of South Dakota, would be $2,200,000. The local earnings for said year, stated above as $407,606.35, using round numbers, would be 18.5 per cent. on said last-mentioned sum. The total earnings from all sources of the complainant company on its lines in the state of South Dakota, for the fiscal year ending June 30, 1895, were $1,236,680.78. The total local earnings for freight and passenger services during the same period were $330,642.85. In round numbers, this would make the local earnings 26 per cent. of the gross earnings from all sources for the year 1895. Twenty-six per cent. of $10,000,000, the value of the complainant's property in the state of South Dakota, would be $2,600,000. The local earnings for said year, stated above as $330,642.85, using round numbers, would be 12.7 per cent. on said last-mentioned sum. The total earnings from all sources for the fiscal year ending June 30, 1896, were $1,557,100.60. The total local earnings for freight and passenger services during the same year were $328,105.95. In round numbers, this would make the local earnings 21 per cent. of the gross earnings from all sources for the year 1896. Twenty-one per cent. of $10,000,000, the value of complainant's property in the state of South Dakota, would be $2,100,000. The local earnings for said year, $328,105.95, using round numbers, would be 15.6 per cent. on said last-mentioned sum. The total earnings from all sources, for the fiscal year ending June 30, 1897, were $1,605,210.66. The total local earnings from freight and passenger services during the same period were $311,005.42. In round numbers, this would make the local earnings 19 per cent. of the gross earnings from all sources for the year 1897. Nineteen per cent. of $10,000,000, value of complainant's property in the state of South Dakota, would be $1,900,000. The total earnings for 1897, $311,005.42, using round numbers, would be 16.3 per cent. on the last-mentioned sum.

It will thus be seen that the local earnings of the complainant's lines on the same proportion of the total value of the road as the local earnings bear to the gross earnings from all sources, in South Dakota, were: For the year 1894, 18.5 per cent.; for the year 1895, 12.7 per cent.; for the year 1896, 15.6 per cent.; for the year 1897, 16.3 per cent.

Now, let us ascertain the per cent. which the local earnings of the road for the four years mentioned would produce on the proportionate valuation above stated, after being reduced by the proposed schedule of the railroad commissioners. For the year 1894 the total local freight earnings were $137,459.88, which, being reduced 17 per cent., would equal $114,091.70. For the same year the total local passenger earnings were $270,146.47, which, reduced 15 per cent., would equal $229,624.50. These reduced local freight and passenger earnings equal $343,716.20. This reduction on the local business would reduce the total earnings from all sources from $1,840,651.79 to $1,-

776,761.64, of which amount the reduced local earnings for the year 1894 would be, in round numbers, 19 per cent. Nineteen per cent. of $10,000,000 would be $1,900,000, and the local earnings, as reduced, would be 18 per cent. of that amount. For the year 1895 the total local freight earnings were $121,442, which, being reduced 17 per cent., would equal $100,796.86. For the same year the total local passenger earnings were $209,200.85, which, being reduced 15 per cent., would equal $177,820.72. Total reduced local freight and passenger earnings, $278,617.58. This reduction on the local business would reduce the total earnings from all sources for that year from $1,236,680.78 to $1,184,655.51, of which amount the reduced local earnings for the year 1895 would be, in round numbers, 23 per cent. Twenty-three per cent. of $10,000,000 would be $2,300,000, and the local earnings for that year, as reduced, would be 12.1 per cent. of that amount. For the year 1896 the total local freight earnings were $110,432.45, which, being reduced 17 per cent., would equal $91,660.93. For the same year the total local passenger earnings were $217,673.50, which, reduced 15 per cent., would equal $185,022.47. Total reduced local freight and passenger earnings, $276,683.40. This reduction on the local earnings would reduce the total earnings from all sources for that year from $1,557,100.60 to $1,505,678.05, of which amount the reduced local earnings for the same year would be, in round numbers, 18 per cent., and 18 per cent. of $10,000,000 would be $1,800,000, and the local earnings for that year, as reduced, would be 15.3 per cent. of that amount. For the year 1897 the total local freight earnings were $102,239.23, which, being reduced 17 per cent., would equal $84,900.06. For the same year the total local passenger earnings were $208,716.19, which, being reduced 15 per cent., would equal $177,408.76. Total reduced freight and passenger earnings, $23,308.82. This reduction on the local earnings would reduce the total earnings from all sources for that year from $1,605,210.66 to $1,556,514.06, of which amount the reduced local earnings for the same year would be, in round numbers, 16 per cent. Sixteen per cent. of $10,000,000 would be $1,600,000, and the local earnings for that year, as reduced, would be 16.2 per cent. of that amount.

It will be thus seen that, if the commissioners' schedule of rates and fares had been in effect during the four years that we have considered, there would have been an earning on the value of the property apportioned to local earnings of 18 per cent. for the year ending June 30, 1894; 12.1 per cent. for the year ending June 30, 1895; 15.3 per cent. for the year ending June 30, 1896; 16.2 per cent. for the year ending June 30, 1897. It certainly would be impossible for this court to find beyond a reasonable doubt that these per cents. allowed to be earned by the railroad company for local earnings would be depriving it of its property without due process of law, or depriving it of the equal protection of the laws. The court has not overlooked operating expenses, or the difference between the cost of earning local and interstate earnings; but the court is of the opinion that, when the local earnings under complainant's schedule show for the years 1894, 1895, 1896, and 1897 a percentage on capital invested of 18.5 per cent., 12.7 per cent., 15.6 per cent., and 16.3 per cent., respectively, and for

the same years under defendants' proposed schedule a percentage of 18 per cent., 12.1 per cent., 15.3 per cent., and 16.2 per cent., then the small reduction, taken in connection with the high percentages earned under it, makes it unnecessary to discuss what the exact amount of the profits would be. This being the view of the court, it necessarily results that the bill must be dismissed, and the temporary restraining order granted in this action dissolved.