## NORTHERN PAC. RY. CO. v. KEYES et al.

### GREAT NORTHERN RY. CO. y. SAME.

### CHICAGO, M. & ST. P. RY. CO. v. SAME.

(Circuit Court, D. North Dakota. December 23, 1898.)

1. INTERSTATE COMMERCE—REASONABLENESS OF RATES.
   In determining the reasonableness of local rates, the court cannot take into consideration the carrier's whole business, both interstate and domestic.[1]

2. SAME—RATES—MILEAGE BASIS.
   Nor can the interstate traffic which originates or terminates in the state be divided upon a mileage basis, and such portion thereof as is done within the state be held subject to state control and considered in fixing rates.

3. SAME—LOCAL COMMERCE—"COST OF TRANSPORTATION."
   From the opinion of expert witnesses, and from the fact that local traffic in North Dakota consists mainly of merchandise, is light in volume, short in haul, and small in individual shipments, the court holds that the "cost of transportation" is, in relation to revenue, at least twice as great for local business as for the entire business of the carriers.

4. SAME—PROPORTIONAL RATES.
   A "proportional" rate for North Dakota, found by dividing the terminal rates on traffic between St Paul and Duluth and points in North Dakota on a ton mileage basis, in such proportion as the number of miles in North Dakota bears to the entire haul is unreasonable, as it does not allow for the length of haul nor for the large amount of terminal business.

5. SAME—EVIDENCE—REASONABLENESS.
   In a suit to enjoin the enforcement of a carrier's schedule prepared by the board of railroad commissioners, a table was introduced in evidence showing the operating expenses of two of the roads affected for four years, and it appeared that, if the schedule as proposed had been in operation at that time, the business of the roads would have been done at an actual loss, and nothing left for a return on the value of the property. *Held*, that the rates of the commission were unreasonably low.

6. COMPULSORY PROCESS AGAINST WITNESS—PRODUCTION OF PAPERS.
   If a party is entitled to documentary evidence, and a witness refuses to furnish it, his remedy is by application to the federal court of the district in which the evidence was taken for process to compel its production.

7. EVIDENCE.
   Evidence in the form of tables representing the average business of railroad companies is receivable in a suit to enjoin the enforcement of a tariff by the railroad commissioners, although covering only occasional or alternate months in the year.

8. PRODUCTION OF PAPERS—TENDER OF COSTS.
   When a party to a suit asks another party to produce in evidence a certain table that would entail great expense in the preparation, he must first tender the expense required.

9. EVIDENCE—TABLES—VERIFICATION.
   In a suit to enjoin the enforcement of a tariff by the railroad commission, a large number of tables were prepared in the accounting depart-

---

[1] For regulation of interstate commerce in general, see note to Board of Assessors v. Pullman's Palace-Car Co., 8 C. C. A. 492.

ments of the several roads affected, showing the amount of business done for a certain period. The work was done by 40 or 50 clerks, under the direction of the general officers. *Held*, that it was not necessary to call the clerks to testify as to the correctness of the tables, as each clerk made but a part of them, but it was sufficient if the records from which the computations were made were placed at the disposal of the opposite party.

C. W. Bunn, for plaintiff Northern Pac. Ry. Co.

M. D. Grover, for plaintiff Great Northern Ry. Co.

George R. Peck and Ball, Watson & Maclay, for plaintiff Chicago, M. & St. P. Ry. Co.

John W. Cowan, Atty. Gen., for defendants.

Before THAYER, Circuit Judge, and AMIDON, District Judge.

AMIDON, District Judge. Chapter 115 of the Laws of North Dakota for the year 1897 empowers the board of railroad commissioners of that state to fix a schedule of maximum rates for the transportation of persons and property within its limits by common carriers, and makes it a crime punishable by fine of not less than $1,000, nor more than $10,000, for any carrier to charge more than the rates thus prescribed. The statute requires the board to serve the schedule of rates prepared by them upon the common carriers to be affected thereby, and to publish notice in a newspaper in each of the judicial districts of the state, fixing the time when such rates will take effect. Acting under this statute, the commissioners prepared and served upon the railroad companies doing business in the state a schedule of rates, and commenced the publication of a notice fixing July 1, 1897, as the date upon which the same should take effect. Thereupon the plaintiffs, the Northern Pacific Railway Company, Great Northern Railway Company, and Chicago, Milwaukee & St. Paul Railway Company, filed their several bills in this court against the board of railroad commissioners, its secretary, and the publishers of the newspapers in which the notice was printed, alleging that the rates prescribed were unreasonable, and such as to afford no return for the use of the property employed by the plaintiffs in carrying on their business in the state, and praying that the further publication of the notice be restrained, and that the board be enjoined from putting the rates in force. After a hearing, a temporary injunction was issued, restraining the defendants from putting the rates into effect during the pendency of the suits. Voluminous testimony has been taken, and the cases are now submitted upon their merits.

At the threshold of this inquiry, it is important to define its limits. Much of the argument of counsel on behalf of defendants is devoted to an attempt to show that, under existing rates, the plaintiffs are earning from their entire business, both interstate and local, a high rate of income upon a grossly excessive capitalization of their property. Conceding this to be true, it would be wholly immaterial, unless it further appears that the income derived from business done wholly within this state—that is, commencing and ending in the state—is such as to produce an unreasonable return upon the fair value of the property employed in doing that business. Excessive income derived from interstate traffic can be reduced by congress alone, which has exclu-

sive jurisdiction of commerce among the states. Excessive income derived from business done in other states can only be reduced by those states. In prescribing rates, the state of North Dakota is limited to that business which is done wholly within its boundaries, and, in determining the reasonableness of such rates, the court cannot take into consideration the carrier's whole business, both interstate and domestic. That question was put to rest by the supreme court in its decision in the case of Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, commonly known as the "Nebraska Rate Case." The court says at page 540, 169 U. S., and page 431, 18 Sup. Ct.:

"It is further said, in behalf of the appellants, that the reasonableness of the rates established by the Nebraska statute is not to be determined by the inquiry whether such rates would leave a reasonable net profit from the local business affected thereby, but that the court should take into consideration, among other things, the whole business of the company; that is, all its business, passenger and freight, interstate and domestic. If it be found upon investigation that the profits derived by a railroad company from its interstate business alone are sufficient to cover operating expenses on its entire line, and also to meet interest, and justify a liberal dividend upon its stock, may the legislature prescribe rates for domestic business that would bring no reward and be less than the services rendered are reasonably worth? Or must the rates for such transportation as begins and ends in the state be established with reference solely to the amount of business done by the carrier wholly within such state, to the cost of doing such local business, and to the fair value of the property used in conducting it, without taking into consideration the amount and cost of its interstate business, and the value of the property employed in it? In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier or the profits derived from it. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates upon domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. It is only rates for the transportation of persons and property between points within the state that the state can prescribe; and, when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business."

This is the most important feature of the decision in that important case. The other questions discussed in the opinion had all been passed upon by former decisions of the court; but this clear and complete separation between the local and interstate traffic of a carrier conducting both kinds of commerce, though following as a necessary conclusion from the commerce clause of the federal constitution, had not before been expressly declared. It is manifestly a doctrine which is destined to have, in the sparsely-settled sections of the West, where local traffic is trifling in comparison with interstate, a far-reaching effect upon the power of states to regulate the business of common carriers.

No state better illustrates the truth of this assertion than North Dakota. The terminals of much the greater portion of its commerce are the cities of St. Paul, Minneapolis, and Duluth, in the state of Minnesota. To those points nearly all the grain, live stock, and other

products of the state are shipped, and from them most of its merchandise, coal, lumber, and other supplies are received. For this reason the main volume of transportation for which the people of North Dakota pay is interstate in character and beyond the state's control. The effect of this condition is strikingly exhibited by the following table of traffic on the Great Northern road for the four years commencing with 1894. Column 1 shows the number of ton miles of strictly local traffic; column 2 the number of ton miles having only one terminal in the state; column 3 the number of ton miles of traffic in the state which passed entirely across the state; column 4 combines the last two items, and shows the total ton miles of interstate commerce:

|  | Ton Miles Local to the State. | Ton Miles Originating or Terminating in the State. | Ton Miles Entirely Across the State. | Total Interstate. |
|---|---|---|---|---|
| 1894....... | 3,170,863 | 106,976,389 | 93,989,336 | 200,965,725 |
| 1895....... | 2,778,999 | 113,282,867 | 137,902,298 | 251,185,165 |
| 1896....... | 3,456,421 | 147,538,631 | 136,077,421 | 283,616,052 |
| 1897....... | 3,988,027 | 122,157,468 | 144,416,544 | 266,574,012 |
| Average.. | 3,348,578 | 122,476,339 | 128,096,400 | 250,572,739 |

Changing these figures to percentages, it will be seen that the local traffic averages less than $2\frac{3}{4}$ per cent. of that which either begins in the state and passes to points outside of it, or begins outside of the state and passes to points within it, and is less than $1\frac{1}{3}$ per cent. of the total interstate traffic moved in the state. The same condition is shown as to the Northern Pacific road. Its average of local ton miles for the four years mentioned was 5,115,826, or only $2^3/_5$ per cent. of the interstate traffic in the state, which was 198,449,763. From these statistics it appears, therefore, that, of all the traffic carried in North Dakota during the four years mentioned, less than 3 per cent. began and ended in the state so as to subject it to state regulation, while more than 97 per cent. was interstate, and thereby subject to the exclusive control of congress. In Minnesota, on the other hand, for the reason that it has its terminals within its own limits, the average of ton miles of local traffic for the same period was 179,285,609, or $46\frac{2}{3}$ per cent. of the total interstate traffic, which was 384,093,273.

The passenger business does not present so wide a contrast, but would seem to be sufficiently marked to justify a difference in rate in the two states, the rate at present being four cents a mile in North Dakota and three cents in Minnesota. During each of the four years mentioned, the average number of passengers carried one mile on the Northern Pacific road in North Dakota was 5,548,981; in Minnesota, 13,436,952. On the Great Northern road the same average for North Dakota was 7,301,211; and for Minnesota, 27,384,769. It will thus be seen that the volume of local passenger business in the latter state is more than three times as great as in the former.

The nature of the local traffic in North Dakota has as important a bearing upon the questions under consideration as the smallness of its volume. The witnesses for the commission, as well as those for the railroads, agree that the principal subject of local commerce is merchandise in less than car-load lots. The Great Northern Company made a compilation of its local business from the way bills for six alternate months of the year 1896. From this it appears that more than 60 per cent. of the entire tonnage consisted of merchandise in less than car-load lots, and that from the carriage of this merchandise more than 80 per cent. of all the company's local freight revenue in the state was derived. The remaining 40 per cent. of local tonnage was made up chiefly of seed grain and lumber, also for the most part carried in small shipments. From two-thirds to three-fourths of the entire local freight of the state emanates from Grand Forks and Fargo, and consists of groceries, hardware, fruit, and farm machinery, which is distributed from these points to the local stations in quantities seldom attaining the proportions of a car load, and is carried, as will be pointed out later, under a special terminal tariff which is but little higher than the terminal tariff out of St. Paul and Minneapolis.

Length of haul is another element of prime importance in determining rates for transportation. It is clearly established by the evidence that the local commerce of North Dakota moves on an average of from 80 to 90 miles, while the average of the general business of the roads in this respect is from 350 to 500 miles.

The testimony leaves no room for doubt that the strictly local traffic of North Dakota consists mostly of merchandise, and is light in volume, short in haul, and small in individual shipments. These are all elements which add materially to the costs of transportation, and justify rates above the average of those for the entire business of the carrier.

Appreciating the force of these facts in respect to the volume and character of traffic in North Dakota, the defense put forth the claim that such interstate traffic as originates or terminates in the state should be divided upon a mileage basis, and such portion thereof as is done within the state held to be subject to state control and taken into consideration in determining the reasonableness of the rates fixed by the commission. This, however, cannot be done. Commerce which begins in one state and passes into another is not less interstate commerce than that which passes entirely across states. If the different states could regulate that portion of interstate commerce which is moved within their respective limits, there would be left no commerce whatever subject to congressional control. This matter has been repeatedly before the supreme court of the United States, and that court has uniformly held, from its decision in Wabash, St. L. & P. Ry. Co. v. Illinois, 118 U. S. 557, 7 Sup. Ct. 4, to the recent decision in Smyth v. Ames, that the states cannot fix rates for, or regulate in any manner, that portion of interstate commerce which moves within their territorial limits. Such traffic, throughout its entire course, is subject to the exclusive jurisdiction of congress.

In order to point out the difference between the present rates of the railroads and those fixed by the commission, it will be necessary to describe briefly the several tariffs under which the business of the plaintiffs is now conducted. Nearly all traffic between subordinate stations is at present moved under the general distance tariff of the roads, in which the rate is based solely on the number of miles the freight is carried. This tariff is the same in North Dakota as in Minnesota, and is much lower in those states than in Montana and the states further west. The distance tariff, however, does not control the principal volume of traffic. That is conducted under what are designated as "terminal tariffs," which apply to all shipments into and out of St. Paul, Minneapolis, Minnesota Junction, Duluth, and West Superior. The rates thereby fixed are lower than those in the distance tariff on account of the volume of business that is moved to and from the points mentioned. Of these terminal tariffs, the most important are three in number. One applies to shipments of live stock in car-load lots; another to shipments of grain, flax seed, flour, mill stuffs, millet seed, and potatoes in carload lots; and the third to merchandise. Of the traffic moved under these terminal tariffs, nearly all is in car-load lots, and much the greater portion in solid train loads. The railroads also have a special merchandise tariff on business out of Fargo and Grand Forks, which is substantially the same as the terminal merchandise tariff out of St. Paul, Minneapolis, and Duluth. The schedule of rates fixed by the commission is likewise a distance tariff. It prescribes rates for all distances between one mile and four hundred, and takes no account of the volume of business, but applies the same rule to the smallest way stations as to terminal points. How does this schedule of the commission compare with the tariffs of the plaintiffs to which we have referred? It is not only lower than the distance tariff in force in Minnesota, a state having more than six times the population of North Dakota, but is likewise lower than any of the terminal tariffs mentioned, with the exception of that on grain, mill stuffs, etc., and as to that is but slightly higher.

While none of the matters to which we have thus far adverted are decisive of these cases, they do tend to throw a strong indirect light upon the primary question under consideration. It is a self-evident proposition that these railroads cannot maintain lower rates for local business in North Dakota than in Minnesota; much less can they maintain for the strictly domestic commerce of that state, which moves in light volume, for short distances, and in small shipments, lower rates than are charged for interstate traffic, which has more than fifty times its volume, is moved more than four times its distance, and is hauled chiefly by car loads and train loads. The result is that one of two propositions must be true. Either the rates fixed by the commission are unreasonably low, or the interstate rates charged by the plaintiffs are grossly excessive; for, if local rates ought to be placed below existing interstate rates, then the latter rates, owing to the volume and character of the traffic, ought, in justice, to be correspondingly reduced.

The fundamental question in all cases like these is, will the rates

prescribed by the state pay the expense of doing the local business, and leave to the carrier a reasonable compensation upon the fair value of the property which it employs in performing the service? Certain of the factors necessary to a determination of this question are capable of definite knowledge; others must forever rest largely upon opinion. The income derived by the carrier from the business which it conducts within the state can be ascertained accurately from the records of the company, but the expense of doing that business is not susceptible of mathematical ascertainment. Many of its items apply equally to local and interstate business. The different kinds of traffic are often carried in the same train, and not infrequently in the same car. It is absolutely impossible to divide the cost of traffic thus moved, and say that this amount should be attributed to local business and that amount to interstate. It is possible, however, to ascertain the relation of the cost of doing the entire business of a railroad to its gross income. These amounts are shown by the books of the company in dollars and cents, and furnish the basis from which all investigation as to the cost of doing local business must start.

The operating expenses of a railroad consist of two principal items: (1) Cost of maintenance of plant; (2) cost of conducting transportation. The former item is constant, and can justly be divided between the different kinds of traffic in proportion to their volume. As to the second item, however, such a division cannot properly be made; for it is agreed, by all who have had occasion to consider the subject, railroad commissioners as well as railroad officials, that the cost of conducting transportation is, relative to income, much higher for local business than for the general business of a road. The causes of this added cost are chiefly three: (1) The shortness of the haul; (2) the lightness of the train loads; (3) expense of billing and handling the traffic. The evidence shows that the average haul on local business in North Dakota is between 80 and 90 miles, while the average haul on the entire business of the roads is from 350 to 500 miles. There is no principle of railroading that is better established than that the cost of doing business rapidly decreases as the length of haul increases; that is, if you double the distance you do not double the cost. This is recognized by the defendants the same as by complainants. For example, the rate fixed by the commission on grain per 100 pounds for 100 miles is 9 cents, while for 380 miles it is 18 cents. Thus, while the length of haul is increased nearly four times, the rate has only doubled. Another element of added cost is the lightness of the load. The evidence clearly shows two things: First, that the trains in which the local business is done do not average more than one-half as many cars as those in which the general traffic of the roads is carried; second, that the cars carrying local traffic are only loaded at from one-tenth to one-half of their capacity. Many of the items of expense in conducting traffic are constant, whether the train is large or small; whether the cars are fully or lightly loaded. The carrier furnishes the power, the vehicle, and the trainmen to do the business. If a train which is capable of hauling 1,000 tons gets only 100 tons to haul, the relative cost of moving the traffic to the revenue which it produces is increased nearly tenfold. This matter was aptly illustrated by one of the

witnesses, who compared it to the raising of wheat. The expense of raising an acre of wheat is substantially the same whether the yield be 10 or 30 bushels, but the cost per bushel in the one case is approximately three times as great as in the other. The third item mentioned is the extra expense of billing and handling local traffic. It costs as much to bill and pass through the records of the company a box of merchandise paying a freight charge of 50 cents as it does to perform the same service for a car load of wheat paying a revenue of $75. Furthermore, the great volume of traffic is loaded by the shipper and unloaded by the consignee, while local freight has to be stored, loaded, and unloaded by the carrier. There are many other minor items of extra expense, which were mentioned by the witnesses on behalf of plaintiffs, to which we do not deem it necessary to advert. Counsel for defendants makes some point of the fact that the same trains that do local business also collect and distribute interstate freight. That, however, is not important. The amount of interstate traffic that is of this parcel character is but trifling when compared with the entire volume, whereas nearly all the local freight in North Dakota is of that kind. All traffic which moves in small shipments for short distances is burdened with a heavy expense in proportion to its income; but if in any class of business the amount of such traffic is small in comparison with the entire volume, as it is in the case of interstate traffic, its effect upon the proportion of cost to revenue for the entire class is slight, whereas if the traffic is mainly of that character, as in the case of local business in North Dakota, its effect becomes controlling.

Many witnesses were called by the plaintiffs to testify in respect to the relation of cost to revenue in the case of local business as compared with the entire business of the companies. By none of them is the expense of conducting transportation placed at less than twice as much in the former case as in the latter. Mr. Erling, the general manager of the Milwaukee road, a person of great experience and apparent candor, stated that the cost of conducting local business on the entire system of that road was at least twice as great as for through business; and that in sparsely-settled communities, like North Dakota, where traffic is light, such cost was four or five times as great in the one case as in the other. This was also the testimony of Mr. Fink in the Nebraska Case, a witness whom both the circuit and supreme court mention as possessing peculiar qualifications for giving a trustworthy opinion upon such matters. The evidence on this subject is wholly uncontradicted. It is given by men whose many years of experience entitles their opinions to credit. The facts which they set forth as the foundation of their estimates impart to them a high degree of inherent probability. It is true that these witnesses are all identified with the business of common carriers, but the subject is confessedly one for expert testimony, and it is not easy to see how persons can be qualified to testify as experts except by experience in the business of which they speak. We are satisfied that the evidence of the plaintiffs on this subject is in the main both correct and trustworthy, and from it we are led to the conclusion that the cost of conducting transportation in North Dakota is, in proportion to

revenue, at least twice as great for local business as for the entire business of the plaintiffs.

Accepting this as an established fact, the decision of these cases becomes plain. The evidence shows that the general operating expenses and taxes for the four years (1894, 1895, 1896, and 1897) on the Great Northern road varied from 60.82 per cent. to 55.09 per cent. of its entire receipts, and on the Northern Pacific road were from 74.19 per cent. to 63.44 per cent. For the same period it is also shown that on the former road the expense of conducting transportation was on an average 30.25 per cent. of its gross income, and on the latter 31.41 per cent. The amount of reduction in revenue that would be caused by the schedule of rates fixed by the commission is at least 13 per cent. The testimony adduced by complainants tends to show that it is considerably more than that. But the computation of Mr. Phelan, the secretary of the board, fixes the reduction at this percentage, and we shall adopt his estimate for the purposes of this opinion. If this percentage of reduction had been applied to the local business of the Great Northern and Northern Pacific roads for the four years mentioned, such business would have been done at an actual loss, and nothing whatever would have been left as a return upon the value of property used in conducting it. This is shown by the following table:

Great Northern.

| | Percentage of Operating Expenses and Taxes to Gross Receipts of Entire Road. | Extra Cost of Local Business. | Total Cost of Local Business. | Earnings as Reduced by Commission. | Deficit or Surplus. |
|---|---|---|---|---|---|
| 1894....... | 60.82 | 30.25 | 91.07 | 87. | 4.07 deficit. |
| 1895....... | 58. | 30.25 | 88.25 | 87. | 1.25 " |
| 1896....... | 55.09 | 30.25 | 85.34 | 87. | 1.66 surplus. |
| 1897....... | 57.86 | 30.25 | 88.11 | 87. | 1.11 deficit. |
| Average.. | 57.94 | 30.25 | 88.19 | 87. | 1.19 deficit. |

Northern Pacific.

| | | | | | |
|---|---|---|---|---|---|
| 1894....... | 74.19 | 31.41 | 105.60 | 87. | 18.60 deficit. |
| 1895....... | 67.81 | 31.41 | 99.22 | 87. | 12.22 " |
| 1896....... | 63.44 | 31.41 | 94.85 | 87. | 7.85 " |
| 1897....... | 69.92 | 31.41 | 101.33 | 87. | 14.33 " |
| Average.. | 68.84 | 31.41 | 100.25 | 87. | 13.25 |

From these tables it appears that for every $100 which the Great Northern received from local business during the four years it was obliged to pay out on an average, as operating expenses, $88.19. If the schedule of rates fixed by the commission had been in force, in place of every $100 of its revenue, the company would have received $13 less, or $87,—an amount which is $1.19 less than the expense of doing the business. For every $100 which the Northern Pacific re-

ceived from local traffic it was compelled to pay out $100.25 in oper-
ating expenses, and if the schedule of rates fixed by the commission
had been in force it would have received only $87, where it did receive
$100, and thus would have conducted its local business at a loss of
$13.25 on every $100 of traffic.

No reference has been made to the Chicago, Milwaukee & St. Paul
road, for the reason that the testimony clearly shows that if the rates
prescribed by the commission are unreasonable, when applied to the
traffic of the Great Northern and Northern Pacific Railroads, it cannot
be justified when applied to the traffic of the Chicago, Milwaukee &
St. Paul. That company has only branch lines in the state of North
Dakota, and the evidence demonstrates that as to its business the rates
now in force are not unreasonable.

In justification of the rates fixed by the commission, two theories
are put forth by its secretary and counsel. The first is based upon
what the secretary denominates "North Dakota's proportional" of
the terminal tariffs for interstate business. The second is based upon
a comparison of the rate per ton mile under the commission's schedule
with the rate per ton mile for the entire business of the roads. In
support of the first theory, the terminal rates on traffic between St.
Paul, Minneapolis, and Duluth and points in North Dakota is di-
vided, on a ton mileage basis, in such proportion as the number of
miles in North Dakota bears to the entire haul, and the rate thus
produced, for that portion of the haul which lies in North Dakota, is
what is designated as "North Dakota's proportional." This result
is invariably found to be less than the rates fixed by the commission,
and it is contended that those rates are thereby proven to be rea-
sonable. This theory disregards many of the elements which have
been considered fundamental in fixing rates. It takes no account of
the length of haul. By the same calculation which it adopts, the
rates fixed by the commission for short distances could be proven to
be unreasonable when compared with their rates for long distances.
For example, the rate fixed by the commission on fourth-class mer-
chandise is 30 cents from Fargo to Mandan. Casselton is an inter-
mediate point 20 miles distant from Fargo. What might be called its
"proportional" of the 30-cent rate, under the theory proposed, would
be 3 cents, whereas the rate fixed by the commission from Fargo to
Casselton is 10 cents. The plan suggested also fails to take any ac-
count of the large volume of business out of terminal points as justi-
fying a reduction of rates from such points.

Under the other theory, the rate per ton mile of the entire business
of the plaintiffs is found to be much less than the rate per ton mile
on local business under the rates prescribed by the commission, and it
is claimed that this fact establishes the reasonableness of the com-
mission's rates. This, however, by no means follows. It is axiomatic
that the rate per ton mile rapidly decreases as the length of haul
increases. The evidence shows, as has already been pointed out, that
the average haul of traffic local to North Dakota is less than one-
fourth of the average haul on the entire business of the roads. This
fact alone would necessitate a much lower rate per ton mile on general
than on local business. But it must be further remembered that the

great volume of traffic carried by the complainants consists of heavy articles, like coal, lumber, grain, and live stock, which are invariably moved at the lowest of all rates; while much the larger portion of local traffic in North Dakota consists of merchandise in less than carload lots, which, under all classifications of freight, is charged a higher rate than any other kind of traffic. In ascertaining the cost per ton mile of doing the entire business of the roads, the enormous tonnage of these heavy commodities is embodied in the calculation. No distinction is made between groceries and lumber, between dry goods and live stock. It needs no argument to show that the average cost per ton mile of a traffic composed mainly of such articles as lumber, coal, grain, and live stock, hauled on an average more than 400 miles, affords no indication of what the average price per ton mile ought to be for a traffic which is made up for the most part of merchandise that is hauled on an average less than 90 miles.

There only remain for consideration two questions of practice. In the course of the taking of the testimony, the attorney general made a demand upon Mr. Kendrick, the general traffic manager of the Northern Pacific road, and upon Mr. Clough, the vice president of the Great Northern road, both of whom were witnesses on behalf of complainants, as follows:

"I now ask you to prepare a table showing the freight handled in each of the four years ending June 30, 1894, June 30, 1895, June 30, 1896, and June 30, 1897, so as to show for each year the amount of freight handled under each of the following classes: (1) Freight shipments local in North Dakota; (2) freight shipped into North Dakota; (3) freight shipped out of North Dakota; (4) freight shipped through North Dakota,—making the table show the number of tons under each class, and the ton miles in each class, for the total actual haul; also show the actual freight receipts for each of the four classes mentioned above."

The witnesses, upon the advice of counsel, refused to furnish these statements. It was admitted at the time that it was physically possible to prepare the tables, and the request was declined upon the ground that the evidence was immaterial, and that the preparation of it would involve great expense and delay. At the opening of the argument of the cases, the attorney general moved the court to strike out the evidence of Mr. Kendrick and Mr. Clough on account of this refusal. There are two sufficient reasons for overruling this motion: First. The remedy which counsel asks is not the one he should have pursued. If he was entitled to this evidence, and the witnesses refused to furnish it, his proper remedy was to apply to the federal court of the district in which the testimony was taken for process to compel its production. Second. If such application had been made, we do not think the process could have been properly granted. The record in this case shows that these tables could only be prepared from an actual examination of all the way bills under which the business of the companies was conducted for the four years named, and by a separation of the business, as shown by those way bills, into the classes mentioned in the demand of the attorney general. This would be a task nearly, if not quite, equal to that of doing over again the entire accounting work for those years. The evidence shows that over 100 clerks are employed by each of the companies in examining the way

bills and reports of the business, and entering the same in their proper accounts. A compliance with the request would therefore have required the plaintiffs to employ a vast force of clerks, for a long period of time, to go over their entire business for those years. We know of no rule of evidence by virtue of which one party to a suit can require another to go to such expense for his benefit, unless the expense is first tendered.

The Great Northern and Northern Pacific Companies, for the purpose of ascertaining the character of the local business and the reduction which would have been made in that business if the rates fixed by the commission had been in force, caused the actual way bills for certain periods to be examined, and the effect upon the business of an application of the commission's rates to be computed. The Northern Pacific selected the months of April and October, 1896, and the Great Northern the months of January, February, April, July, October, and November of the same year. The officers of the roads testified that these months were such as would fairly represent the average business of the companies, and that the only reason why the same investigation was not conducted for a longer period was the great expense and labor involved. The attorney general objected to this evidence, not upon the ground that the months selected had not been honestly selected for the purpose of showing the business of the companies, but that it was impossible that the business of the companies for a term of years could be fairly shown by the periods selected, owing chiefly to the shortness of those periods. We do not think this objection is well taken. It goes to the trustworthiness of the evidence, but certainly affords no grounds for its entire rejection. This is especially true when it is taken in connection with other testimony, tending to show that the relative volume of local and interstate business is fairly represented by the periods selected, and that those periods also fairly represent the business of the companies during the years under investigation.

A large number of tables were prepared in the accounting departments of the several roads bearing upon different features of the business of the companies for the years 1894, 1895, 1896, and 1897. These tables were compiled pursuant to the directions of general officers, who testified that they were correct, according to their best judgment and belief. The record shows that from 40 to 50 clerks were employed by each of the companies in the preparation of the different tables. These clerks were not called to testify that the several computations made by them were correct, but the heads of departments under whose immediate supervision the work was done were called as witnesses, and the method of preparing the figures from which the tables were compiled was fully explained and their trustworthiness shown. The clerks were also present in the building where the testimony was taken, as were likewise the way bills and other records from which they made their computations. Counsel for defendants was invited to call any of the clerks for the purpose of cross-examination, and was given the freest access to all the papers and records from which the computa-

tions were made. He objected to the evidence upon the ground that it was incompetent. The objection cannot be sustained. To have called each of the clerks would have added very little to the trustworthiness of the evidence. No clerk conducted any entire investigation, but various details were placed in the hands of 40 or 50 different employés, and each contributed his computation to the general result. No clerk could have testified that the tables were correct, for the reason that they were not made by him; neither could any single clerk testify that the figures from which the tables were compiled were correct, for he only contributed a small fragment to the general result. The method adopted was the only practicable one for conducting the investigation. It would have been absolutely impossible for any one man to have compiled the general result without delaying the case for years. A reasonable safeguard against falsification in the preparation of such statements is furnished by placing the records from which they are compiled freely at the disposal of the adverse party. It was the duty of the companies to do this, and to give the attorney general the fullest assistance in explaining such records, and to allow him to place the same in the hands of expert accountants, if he so desired, for the purpose of detecting error or falsification in the testimony as prepared by the companies. The record shows that this was done throughout the taking of the testimony in these cases. We must assume that the attorney general was satisfied of the correctness of the testimony from the fact that he declined to investigate its trustworthiness.

Counsel for defendants cites as directly in point a recent decision of the United States circuit court for the district of South Dakota in the case of Railway Co. v. Tompkins, 90 Fed. 363, which involved substantially the same issues as the cases under consideration. There can be no criticism of the law as declared in the opinion in that case, but the learned judge seems to have proceeded upon a fundamental error of fact. In determining the rate of income which the company was earning upon the value of its property as fixed by the court, no allowance whatever is made for operating expenses, but the entire gross receipts of the road are treated as net profits. This error greatly weakens, if it does not destroy, the authority of the opinion.

It follows from what has been said that a decree must be entered in each of the cases in accordance with the prayer of the bill therein, and it is so ordered; but, following the practice adopted in the case of Smyth v. Ames, right will be reserved in the decree to the commission to apply to the court for such further relief as it may be advised, in case circumstances shall so change that the rates fixed by them will yield to the companies a reasonable compensation for the services required.

THAYER, Circuit Judge, concurs.