# ATCHISON, T. & S. F. RY. CO. *et al.* v. STATE.

No. 2905.   Opinion Filed April 23, 1912.

Rehearing Denied April 27, 1915.

(148 Pac. 144.)

1. **CARRIERS—Rates—Finding of Corporation Commission—Evidence.** A finding of the Corporation Commission that the rates charged by certain railway companies on shipments of live stock between points within the state are so unreasonably high, compared with charges made for similar service in other states where competing markets are located and for similar service on interstate shipments to such competing markets, as to result in an unjust discrimination against industries and markets located within the state, will not be disturbed on appeal to this court, when there is evidence reasonably tending to support such finding.

2. **SAME.** An order of the Corporation Commission prescribing a schedule of rates to be charged on shipments of live stock suitable for packing house purposes will not be set aside on appeal as unreasonable, unjust, and confiscatory, where the evidence fails to show the cost of service for which the rates are to be charged, or the capital invested by the carriers and used in rendering such service, and fails to show that said rates will not yield a sufficient revenue to pay the cost of service for which they are charged, and to enable the class of traffic on which they are charged to contribute its fair and just share of the revenue necessary, in addition to paying the expenses of service and general maintenance of the carrier's road, to enable the carrier to receive a reasonable dividend upon the value of the investment used in maintaining said service.

(Syllabus by the Court.)

## *Appeal from Corporation Commission.*

Appeal by the Atchison, Topeka & Santa Fe Railway Company and others from an order of the Corporation Commission in a proceeding instituted by the Commission of its own motion.   Order of Commission affirmed.

*C. O. Blake, Cottingham & Bledsoe, Clifford L. Jackson, R. A. Kleinschmidt, Edgar A. De Meules, E. R. Jones,* and *Lovick P. Miles,* for appellants.

*Chas. West,* Atty. Gen., and *Chas. L. Moore,* Asst. Atty. Gen., for the State.

HAYES, J. Appellants prosecute this appeal to reverse what is designated as final order No. 437 of the Corporation Commission of the state, whereby certain rates of compensation and rules and regulations governing the transportation of live stock between points within the state are promulgated. Appellants have treated the two assignments of error relied upon in their brief as presenting the following three propositions, to wit: First, that the findings and order of the commission are not supported by the evidence; second, that each of the several schedules of rates prescribed by the order is unreasonable and unjust; third, that the order violates the state and federal Constitutions, in that it directly affects interstate commerce.

The proceeding which resulted in the order complained of was instituted by the commission of its own motion by giving notice to appellants on the 13th day of January, 1911, that a proposed order prescribing rates that should be charged by the railway companies in the state for transporting in car load lots, cattle, calves, hogs, sheep, and goats was contemplated by the commission, and that a hearing on such proposed order would be had before the commission on the 25th day of January, 1911. This action of the commission was taken after many complaints had been made to it that the rates in force by the various railways of the state on shipments of live stock between points within the state were so high and discriminatory, as compared with rates prevailing for similar shipments in other states and from this state to other states where packing industries are maintained, that the locality of Oklahoma City and its market for beef cattle to supply its packing industries were greatly prejudiced.

The evidence introduced at the trial, which is voluminous, consists exclusively of the testimony of witnesses expert in the matter of rates to be charged by railway companies for carrying the kind of traffic involved in the order, and familiar with various schedules of rates in force in other states where packing industries are located and with rates applied to interstate shipments from this state and from other states to such similar industries located in other states. The cause was tried before the commission principally upon the theory that the rates in force by the various railways in this state on shipments of fat cattle and hogs suitable for packing house purposes before the promulgation of this order were , as compared with rates charged for similar services in other states and for similar interstate services, unreasonably high and discriminatory. It will not be necessary to set out here at any great length the evidence contained in the record. We have read it all carefully, and are of the opinion that there is sufficient evidence to sustain the conclusion and finding of the commission that the rates heretofore in force and complained of by the shipping public and the packing industry located at Oklahoma City were so high as compared with rates prevailing in other states under similar conditions, and as compared with charges made for interstate shipments out of the state to other markets, as to result prejudicially to, and discriminate against, the Oklahoma City market.

The power exercised by the commission in promulgating the order complained of is to be found granted by the terms of section 18, art. 9, of the Constitution, which in part provides that:

"The commission shall have the power and authority and be charged with the duty of supervising, regulating, and controlling all transportation and transmission companies doing business in this state, in all matters relating to the performance of their public duties and their charges

therefor, and of correcting abuses and preventing unjust discriminations and extortion by such companies; and to that end the commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just. * * * "

It will be ovserved that the language conferring upon the commission power and authority to control transportation companies "in all matters relating" to "preventing unjust discrimination" is very broad, and the power is not confined to discriminations between individuals or classes of individuals. The language is comprehensive enough to include the prevention of unjust discriminations between localities and classes of traffic. It will also be observed that the Constitution does not by its terms, further than is implied by the term "unjust discrimination," limit or restrict the commission in determining what is a discrimination that it may prevent by the adoption and promulgation of rules and regulations. It follows that what constitutes an "unjust discrimination" under this provision of the Constitution is largely, if not entirely, a question of fact.

In *Ft. Smith & Western Ry. Co. et al. v. State et al.,* 25 Okla. 866, 108 Pac. 407, wherein the question involved was somewhat similar to the question involved in this case, it was held that, if there is any evidence reasonably tending to support the findings of fact of the commission that the rates enforced by the public carriers for transportation between points within the state are unreasonably high and unjust, the findings and order of the commission thereon prescribing a schedule of lower rates will not be disturbed.

It should be here mentioned that this appeal is prosecuted jointly by all of appellants; that their complaint

against the order promulgated is that the entire schedule of rates contained therein is unreasonable and unjust as applied to all of appellants. No effort has been made to distinguish the effect of the application of the rates to one of appellants as being different from that upon the other appellants, or to show that any particular rate of the schedule is unjust. The attack is against the entire schedule, taken as a whole, and as applied to all of appellants. The evidence establishes that until within a short time before the promulgation of the order no packing industry of sufficient importance existed in the state to create a market for fat cattle and hogs for packing purposes, but that within about 12 months prior to this proceeding there has been completed in Oklahoma City by Morris & Co. an extensive modern packing plant capable of using and requiring for its operation a large quantity of fat cattle and hogs, and that there was at the time of the hearing in process of construction a second plant of the same character by Sulzberger & Sons Company. By reason of the establishment of these plants in Oklahoma City, that point has become a competing market for fat cattle and hogs with the cities of Ft. Worth, Wichita, St. Joe, and Kansas City. It is admitted that the rates prevailing and enforced heretofore in this state by the railway companies were made without reference to any market existing in the state for fat live stock, and that there existed heretofore in the state on such traffic and the products of packing plants no commodity rates. It is also admitted by witnesses, testifying for appellants, that the establishment at any point of packing industries of the importance of those recently established in Oklahoma City usually requires, and has always been followed by, a readjustment of rates on the products required by such industries and sold by them, in order that the rates to each competitive industry, relatively speaking, might be reasonable and just, and give to none of the competing localities an unfair

advantage over the others. The evidence fully establishes that the railway companies recognized that Oklahoma City was entitled to such a readjustment of rates, and efforts, before the present proceeding was instituted, were made by the railway companies to arrive at a readjustment which would be satisfactory to all parties concerned, including the competitive points of Ft. Worth, Wichita, and Kansas City; but, for some reason that does not clearly appear from the record, no readjustment was ever effected, except as to some few rates, which, in so far as they were changed, operated unfavorably to Oklahoma City.

As a part of the testimony of C. B. Bee, rate expert for the commission, exhibits were filed giving the rates on cattle in force at the time of the hearing before the commission in the states of Kansas, Nebraska, Iowa, Missouri, Texas, Illinois, and Oklahoma. These exhibits establish that for distances of 25, 50, 150, and 200 miles the rates for these states are respectively as follows:

| Miles. | Kan. | Neb. | Iowa | Mo. | Tex. | Ill. | Okla. |
|---|---|---|---|---|---|---|---|
| 25 | 5.5 | 6.8 | 6.6 | 5.5 | 7.5 | 6.5 | 7.0 |
| 50 | 7.5 | 8.9 | 8.0 | 8.5 | 10.0 | 7.7 | 9.5 |
| 100 | 11.5 | 13.6 | 10.0 | 11.0 | 12.5 | 9.5 | 14.0 |
| 150 | 14.0 | 16.2 | 11.3 | 13.0 | 15.0 | 10.8 | 19.0 |
| 200 | 16.0 | 18.7 | 12.6 | 15.0 | 17.5 | 12.5 | 21.5 |

It will be observed that on hauls of 25 miles the rate in Oklahoma is higher than in any other of the named states, except Texas, and that it is approximately 9 per cent. higher than the average rate for this distance enforced in the six other states named. It will also be observed that the rate on all hauls of 50 miles and above to 200 miles is higher in Oklahoma than in any of the other states named, except Texas, and that it ranges from 12 per cent. on hauls of 50 miles to 42 and 40 per cent. on hauls of 150 and 200 miles higher than the average rate charged in the six other states named. The markets with which Oklahoma is brought into keenest competition are

Ft. Worth, Wichita, and Kansas City. For a haul of 100 miles in Kansas the rate is 11.5 cents for 100 pounds; in Texas, 12.5 cents; in Oklahoma, 14 cents. On a haul of 150 miles, in Kansas, 14 cents; in Texas, 15 cents; in Oklahoma, 19 cents. On a haul of 200 miles, in Kansas, 16 cents; in Texas, 17.5 cents; in Oklahoma, 21.5 cents. By similar evidence it is established that the difference in the rates charged on intrastate shipments on hogs in this state and in the six other states named is greater, ranging from 18 per cent. higher than the average rate on hauls of 25 miles to 55 per cent. higher on hauls of 150 miles.

The evidence also establishes that the Oklahoma scale of rates applied to intrastate shipments is much higher than the scale applied to interstate rates from points in Oklahoma to packing centers in Missouri, Kansas, and Texas, and also that the rates on interstate shipments into Oklahoma are greater than from the same points to packing centers in the other states. As an illustration, it is shown that from Alva, Okla., to Wichita, Kan., a distance of 125 miles, the rate is 12.5 cents per 100 pounds; whereas, if the Oklahoma City scale were applied it would be 16.5 cents. From Curtis to Wichita, a distance of 162 miles, the rate is 16.5 cents. Under the Oklahoma scale it would be 19.5 cents. From Gibbon to Wichita, a distance of 95 miles, the rate is 10 cents. Under the Oklahoma scale it would be 14 cents. Similar evidence was given as to the rates from some 15 stations in Oklahoma to Wichita showing that the scale of rates applied ranges from 8 to 48 per cent. lower than they would be if the Oklahoma scale applied. It is shown that on shipments of cattle originating on the Midland Valley Railroad, and passing over the Missouri, Kansas & Texas lines to Kansas City from the station of Pawhuska, a distance of 223 miles from Kansas City, is 16.5 cents; that upon the same

shipment to Oklahoma City, a distance of 131 miles, it is 17.5 cents, or at a rate per ton mile to Oklahoma City twice as great as to Kansas City. From the town of Haskell, a distance of 274 miles from Kansas City, the rate is 21 cents. From the same station to Oklahoma City, a distance of 160 miles, it is 20 cents, or a disparity of 33 1-3 per cent. per ton mile against Oklahoma City. It is shown that on shipments of cattle from Pleasanton, Kan., to Kansas City, over the Frisco, a distance of 74 miles, the rate is 9 cents; that under the Oklahoma scale it would be 12 cents. From Ft. Scott, a distance of 99 miles, the rate is 10.5 cents, and under the Oklahoma scale would be 14 cents. From Cedar Point, over the Santa Fe Railroad, a distance of 167 miles, the rate is 14 cents. Under the Oklahoma scale it would be 20 cents. There is evidence as to other points on the foregoing railways and various points on other railways, all showing that the interstate rates from such points to Kansas City are made under a scale that ranges from 33 1-3 per cent. to 68 per cent. lower than such rates would be if charged under the Oklahoma scale.

There is considerable evidence in the record tending to show that, where interstate rates have been established for shipment of live stock into this state from points in the territory in which these markets must compete, such rates are on a higher basis than the rates for similar service to the markets competing with Oklahoma City, and that the interstate rates on shipments out of this state to such markets are lower than rates for corresponding shipments from adjoining states to the Oklahoma City market. This evidence was without special application to the question considered by the commission, as the State Corporation Commission is without authority to regulate interstate rates, further than that such evidence was of value to show a general purpose upon the part of the rail-

way companies to discriminate against Oklahoma City, or that, in harmony with the admissions of appellants, the establishment of the packing industry at Oklahoma City and the creation of a market to supply that indutsry requires a general readjustment of rates; the former rates both upon intrastate shipments and interstate shipments not having been made with any relation to a market at Oklahoma City for packing house products. It is evident that, if a higher freight rate is charged on shipments of cattle into Oklahoma City than is charged for similar services in shipping cattle to its competing markets, or a longer haul under similar conditions is made to the other markets for the same money that shorter hauls are made to the Oklahoma City market, then the Oklahoma City packers must pay a price in excess of that paid by the packers at the competing points in order to obtain a supply of stock, and, failing to do this, the shipper in the trade territory naturally tributary to Oklahoma City will ship to the rival markets, where a more favorable freight rate may be obtained. There is evidence tending to show that on account of the unreasonable rates charged the packing industry at Oklahoma City has been unable to secure live stock with which to operate.

It is not contended that Oklahoma City, as a market for fat live stock, is attended by any natural or commercial disadvantages that do or would prevent it, with fair freight rates, from competing with Wichita, Ft. Worth, and other competing markets. Nor have appellants made any attempt to show that the cost of service in intrastate shipments in Oklahoma is greater than the cost of similar service rendered in the other states with whose rates comparison has been made; but appellants have attempted to justify the admitted disparity in rates by showing that there are dissimilar circumstances and conditions that attend some of the service for which the lower rates are

charged and with which comparison has been made. Those circumstances are competition from competing lines of railway, cross-country competition, and regulation of rates by legislative enactments or by orders of the corporation commissions. It is sought to show that the rates enforced in Kansas are the result of legislative enactments, but this contention loses much of its force when it is shown by the evidence that the scale of rates enforced in Kansas is lower than the maximum allowed by the act referred to. Several years ago, when there was much open range, and cattle could be driven easily across the country, it is shown that the cattle were not always shipped upon the line of railway furnishing a station nearest to the location of cattle to be shipped, but that reduced rates from a competing line of railway resulted in the cattle being driven across the country to the station on the competing line at which a lower rate could be obtained. As a result of this practice, lower rates were often established in order to hold or secure traffic that would otherwise be lost to the carrier making the reduced rate; but the evidence tends to establish, and the commission finds, that during recent years the country has been so broken up by farms and inclosed in pastures that driving across country is so impracticable as not to be any longer of substantial consequence in its effect upon rates. It appears that the rates in Texas, which have been used as a basis of comparison, were established by the Railway Commission in that state, and they cannot be said to be wholly voluntary rates, but they have been long acquiesced in by the railway companies of that state, and, since no rates can be enforced against railway companies, although promulgated by commissions, if they are unjust and unreasonable, in that they are so low as not to pay the cost of service and yield to the company a reasonable income upon its investment, and since it must be presumed that if rates do not pay the cost of service for which they are charged and yield such

income the railway companies will not acquiesce therein, we think, although the Texas rates were prescribed by the commission, they are not without probative value in this proceeding, and may be considered in connection with all the other circumstances in this cause by the commission to determine whether the rates enforced in this state for similar service are relatively so high as to operate prejudicially and as an injustice to the locality complaining. Under all the evidence, we think the commission's finding that the intrastate rates in force in Oklahoma at the time of the hearing were unjustly discriminatory against the Oklahoma City market should not be disturbed.

The order of the commission promulgates a schedule of rates on a mileage scale for the movement of live stock between points within the state. The rates prescribed by the order are lower than those complained of, and supplanted by, the order. In their first specification of error appellants complain that the rates prescribed are unreasonable and unjust in each of the several schedules; but the proposition presented by this part of the specification of error is not urged in the brief of appellants' counsel, and the record fails to contain sufficient data to enable us to determine that question, if it had been urged, for the reason that there is no data in the record showing the cost of service for which the rates are to be charged or the capital of the companies invested, or that the revenue derived therefrom will not be sufficient to pay the cost of service and enable this class of traffic to contribute its share of revenue toward paying the expense of maintaining the service and yielding to the companies a reasonable dividend upon their investments.

The contention presented by the second specification of error, that the order interferes with and burdens interstate commerce, is, we think, without merit. It is settled by the decided cases that a state cannot enforce unreason-

ably low rates for domestic transportation upon the ground that the carrier is earning large profits on its interstate business. The intrastate traffic must bear its fair and just share of the cost of maintaining the service, and contribute its share of revenue to enable the investors in the property of the railway companies to realize a reasonable dividend thereon. In promulgating rates to be charged on intrastate traffic, the state must be governed by what is just and reasonable as between the carrier and the public with respect to that traffic. Interstate traffic cannot be made to bear the losses of intrastate business, nor *vice versa.* Among the authorities so holding are: *Smyth v. Ames,* 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; *L. & N. R. Co. v. Eubank,* 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416; *Northern Pac. Ry. Co. v. Keys et al.* (C. C.) 91 Fed. 47; *Shepard v. Northern Pac. Ry. Co.* (C. C.) 184 Fed. 765. The order of the commission does not undertake to prescribe rates to be charged on interstate traffic; nor is there any evidence tending to show that the rate prescribed, when enforced, will result in a loss that must be borne by interstate traffic, or that the rates upon the traffic involved in these schedules will not permit this traffic to produce its just proportion of the revenue that should be produced by intrastate traffic.

There was much evidence introduced relative to rates charged upon interstate business between various points as heretofore stated; but such evidence was introduced for the purpose of forming a basis of comparison to enable the commission to determine whether the rates complained of were unjustly discriminatory, and not for the purpose of forming a basis of any order relative to interstate commerce.

The order of the commission is affirmed.

TURNER, C. J., and WILLIAMS, KANE, and DUNN, JJ., concur.